IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, Respondent, v. IAN ANTHONY GANTT, Appellant. | No. 84445-8-I<br><br>DIVISION ONE<br><br>PUBLISHED OPINION |

DíAZ, J. — A jury convicted Ian Anthony Gantt of five felonies committed against his daughter, K.G.[1] These convictions included incest, child molestation, and rape of a child. Gantt appeals his conviction on numerous grounds, including that RCW 9A.64.020, criminalizing incest, is facially unconstitutional. He also claims there was insufficient evidence for certain convictions and that other irregularities occurred at trial and sentencing. We affirm Gantt's conviction.

## I.     BACKGROUND

Gantt has two biological daughters, K.G. and S.G., born in 1999 and 2002 respectively. When K.G. was 11 years old, Gantt and her mother began living in separate residences. There was no formal parenting or custody plan in place. The

---

[1] We will use the victim(s) initials to protect their privacy.

daughters frequently moved between their parents' residences. K.G. usually visited her father alone.

At trial, K.G. testified that Gantt began sexually abusing her when she was 11 years old. Gantt's abuse started with him inappropriately touching K.G. while she slept in the same bed as him. K.G. was "scared," but believed that Gantt was asleep as he had been taking sleeping pills. This abuse escalated to increasingly intrusive contact, including digital penetration. When K.G. was 14, she confronted Gantt about the abuse. In response, Gantt reacted angrily and said "[i]f I'm going to get in trouble for it, I might as well remember doing it."

After that point, Gantt's abuse further escalated and he frequently forced K.G. to have sexual intercourse with him, against her stated wishes. This type of abuse continued until K.G. was 17 years old, when she disclosed Gantt's abuse to a high school friend in January 2017, following an attempted suicide. The friend successfully encouraged K.G. to tell a high school counselor, who alerted law enforcement.

Immediately thereafter, K.G.'s underwent a sexual assault examination. As part of the exam, K.G. disclosed that Gantt had been assaulting her for "years." The DNA sample taken during the exam matched Gantt's.

Gantt was arrested and the State charged him with the following five crimes: two counts of incest in the first degree under RCW 9A.64.020(1), one count of child molestation in the second degree, one count of rape of a child in the second degree, and one count of rape of a child in the third degree.

While the case was still in discovery, S.G. disclosed to detectives that Gantt

had also abused her.  S.G.'s abuse also had started when she was 11 years old. At trial, the parties contested the admissibility of S.G.'s testimony under ER 404(b). The court allowed the evidence for the limited purpose of showing a common scheme or plan and gave a limiting instruction.

Also at trial, Gantt requested an instruction for a lack of volition defense for the child molestation (count 2) and the rape of child (count 5) charges, both in the second degree, under the theory he had been asleep during the underlying acts. The court ultimately gave the instruction only for count 5, a strict liability offense. The court reasoned that it would be "duplicative" to issue a volitional instruction for count 2 when the State was already required to establish a *mens rea* element, namely that he did these actions for the purpose of sexual gratification, which presumes consciousness.

On May 2, 2022, a jury found Gantt guilty on all five counts.  On August 12, 2022, Gantt was sentenced to five concurrent prison terms, the longest of which was 245 months for rape of a child in the second degree.  On the same day, Gantt appealed.  On July 14, 2023, Gantt filed a Statement of Additional Grounds for Review ("SAG").

## II.     ANALYSIS

### A.     Constitutional challenge to RCW 9A.64.020

Under RCW 9A.64.020(1)(a), "[a] person is guilty of incest in the first degree if he or she engages in sexual intercourse with a person whom he or she knows to be related to him or her, either legitimately or illegitimately, as . . . [a] descendant."

"'Wherever possible, it is the duty of this court to construe a statute so as to

uphold its constitutionality.'" State v. Batson, 196 Wn.2d 670, 674, 478 P.3d 75 (2020) (quoting State v. Abrams, 163 Wn.2d 277, 282, 178 P.3d 1021 (2008)). A challenger "has the burden of proving the statute is unconstitutional beyond a reasonable doubt." State v. Watson, 130 Wn. App. 376, 378, 122 P.3d 939 (2005) (citing City of Seattle v. Eze, 111 Wn.2d 22, 27, 759 P.2d 366 (1988)). A statute's constitutionality is reviewed de novo. Batson, 196 Wn.2d at 674.

Gantt claims RCW 9A.64.020 is facially[2] unconstitutional, first, "because it prohibits private sexual acts between consenting adults." Gantt appears to misunderstand what he must show to successfully facially challenge the statute. "[A] successful facial challenge is one where *no set of circumstances exists* in which the statute, as currently written, can be constitutionally applied." City of Redmond v. Moore, 151 Wn.2d 664, 669, 91 P.3d 875 (2004) (emphasis added); In re Detention of Turay, 139 Wn.2d 379, 417 n. 27, 986 P.2d 790 (1999) (citing Ada v. Guam Soc'y of Obstetricians & Gynecologists, 506 U.S. 1011, 1012, 113 S. Ct. 633, 121 L. Ed. 2d 564 (1992)).

Rather than meeting this standard, Gantt is simultaneously (a) attempting to show that there is one application of the statute that, *for the sake of argument*, could be unconstitutional (namely, barring intercourse between consenting adults), while (b) effectively conceding that RCW 9A.64.020 is constitutional where the

---

[2] During oral argument, Gantt's attorney clarified that his constitutional challenge was solely facial. State v. Gantt, No. 84445-8-I (September 26, 2023), at 1 min., 30 sec., through 1 min., 40 sec., video recording by TVW, Washington State's Public Affairs Network, https://tvw.org/video/division-1-court-of-appeals-2023091215/?eventID=2023091215. Nonetheless, we will address each of his major arguments as presented in his briefing and at oral argument.

incest is committed against a minor or one who could not legally consent. Under Moore, the former showing is irrelevant and the latter concession alone defeats Gantt's facial challenge. That is, the fact, which Gantt implicitly acknowledges, that there is one circumstance (e.g., had K.G. been under age 16) in which RCW 9A.64.020 can be constitutionally applied dooms his facial challenge.

And indeed, this and other courts that have considered the matter have held that criminalizing incest, particularly committed against minors or those unable to consent, is constitutional because the prohibition against such conduct does not implicate a fundamental right and the state has an interest in preventing such acts.

Nonetheless, Gantt urges us to analyze this statute under the strict scrutiny standard because "autonomy in matters of sexual intimacy is a *fundamental right*."[3] In support, Gantt cites to both Washington and federal caselaw, including In re Custody of Smith, 137 Wn.2d 1, 13, 969 P.3d 21 (1998); Obergefell v. Hodges, 576 U.S. 644, 135 S. Ct. 2584, 192 L. Ed. 2d 609 (2015); and Lawrence v. Texas, 539 U.S. 558, 123 S. Ct. 2472, 156 L. Ed. 2d 508 (2003). None of these cases, which we address in turn, supports Gantt's arguments.

In re Custody of Smith specifically dealt with the "fundamental right to

---

[3] Strict scrutiny applies to laws burdening fundamental rights or liberties. In re K.R.P., 160 Wn. App. 215, 229-30, 247 P.3d 491 (2011). To survive strict scrutiny, the law must be narrowly tailored to serve compelling state interests. State v. Dawley, 11 Wn. App. 2d 527, 530, 455 P.3d 205 (2019). Conversely, under a rational basis review, a law need only be "rationally related to a legitimate government interest." American Legion Post #149 v. Dep't of Health, 164 Wn.2d 570, 604, 192 P.3d 306 (2008). Rational basis review "is the most relaxed level of scrutiny" and "applies when a statutory classification . . . does not threaten a fundamental right." State v. Armstrong, 143 Wn. App. 333, 337, 178 P.3d 1048 (2008).

5

autonomy in child rearing decisions." 137 Wn.2d at 13. Similarly, Obergefell v. Hodges was focused on the idea that "[s]ame-sex couples may exercise the fundamental right *to marry*." 576 U.S. at 647 (emphasis added).[4] Both cases expressly cabined their analyses to each specific fundamental right. Smith, 137 Wn.2d at 13; Obergefell, 576 U.S. at 646 ("Without the recognition, stability, and predictability marriage offers, children suffer the stigma of knowing their families are somehow lesser."). Nowhere did either case assert a sweeping fundamental right to "intimate association with the partner of one's choice," as argued by Gantt.[5]

Lawrence v. Texas struck down a Texas statute criminalizing sodomy between same-sex partners. 539 U.S. at 578-79. The Court held that, as "two adults who, with full and mutual consent from each other . . . [t]he petitioners [were] entitled to respect for their private lives." Id. at 578. However, this court has already found that Lawrence "[did] not employ a fundamental rights analysis, but instead applied a rational basis review[.]" State v. Clinkenbeard, 130 Wn. App.

---

[4] At oral argument, Gantt emphasized a statement in Obergefell v. Hodges, 576 U.S. 664, 678, 135 S. Ct. 2584, 192 L. Ed. 2d 609 (2015), where the Court stated that Lawrence overturned a case that had "upheld state action that denied gays and lesbians a fundamental right." Wash. Ct. of Appeals oral argument, supra at 20 min., 25 sec., through 21 min., 10 sec. However, this statement was made in passing, is dicta, and most importantly does not pretend to represent an analysis of, or dispute, the many prior state and federal cases finding Lawrence did not create such a fundamental right, as will be discussed below.

[5] At oral argument, Gantt cited, for the first time, to "a long paragraph of string cites" in Dobbs v. Jackson Women's Health Org., 142 S. Ct. 2228, 2258, 213 L. Ed. 2d 545 (2022), which Gantt claims listed extant fundamental rights and which includes Lawrence's "right to engage in private, consensual sexual acts" of any kind. Wash. Ct. of Appeals oral argument, supra at 20 min., 40 sec., through 21 min., 16 sec. Reliance on this citation is unavailing as the statement is also dicta and also fails to address ample precedent elsewhere finding Lawrence created no such fundamental right.

552, 563, 123 P.3d 872 (2005). Stated otherwise, we held that "[t]his application of rational basis review implicitly asserts that the right to consenting adults to engage in private, sexual behavior does *not* rise to the level of a fundamental right." Id. (emphasis added).

We find no reason to disturb that holding, no less because a plethora of federal and state courts also agree that Lawrence did not establish such a fundamental right, *and specifically so as to incest*. See Muth v. Frank, 412 F.3d 808, 810 (7th Cir. 2005) ("Lawrence . . . did not announce . . . a fundamental right . . . for adults to engage in all manner of consensual adult conduct, specifically in this case, incest."); Lofton v. Sec'y of Dep't of Children & Family Servs., 358 F.3d 804, 815 (11th Cir. 2004) (rejecting the assertion Lawrence created a fundamental right); Lowe v. Swanson, 663 F.3d 258, 264 (6th Cir. 2011) (distinguishing Lawrence from laws criminalizing incest, which is a "far greater and much different" interest); People v. Scott, 157 Cal. App. 4th 189, 68 Cal. Rptr. 592 (2007) (Lawrence had no impact on laws prohibiting sexual relationships where "consent might not easily be refused.").

As it is clear a fundamental right is not implicated, we reaffirm that this statute is not subject to strict scrutiny, but to a rational basis review. And, this court has already upheld the constitutionality of RCW 9A.64.020 under a rational basis review, although in a slightly different context. State v. Kaiser, 34 Wn. App. 559, 663 P.2d 839 (1983) (equal protection challenge). In Kaiser, this court cited numerous justifications that met rational basis review, including the "prevention of mutated birth . . . protect[ing] family harmony . . . [and] protect[ing] children from

7

abuse of parental authority." Id. at 566. Further, this court held that "society cannot function in an orderly manner when age distinctions, generations, sentiments and roles in families are in conflict." Id. Finally, when considering that the age of consent to sex differs from the age of majority, we held that "[t]he State has a legitimate interest in protecting children from parental abuse for an additional 2 years. Whether by consanguinity or affinity, *parents have tremendous emotional and material leverage,* even after a child reaches 16[.]" Id. at 567 (emphasis added).

We find no reason to disturb those holdings and reaffirm that RCW 9A.64.020 supports the State's interest in prohibiting harm to children, who when placed in these situations are vulnerable to abuse, manipulation, and a coercive power dynamic within some families, which robs them of true agency and may subject them to profound emotional damage.

Finally, this holding is expressly consistent with Lawrence, which was based, in part, on the fact that "[t]he present case *does not involve minors.*" Lawrence, 539 U.S. at 560 (emphasis added). The Supreme Court emphasized that the case at bar did not involve *"persons who might be injured or coerced* or who are situated in relationships *where consent might not easily be refused*." Id. at 578 (emphasis added). As such, Gantt's reliance on Lawrence for the claim that autonomy in matters of sexual intimacy is a fundamental right subject to strict scrutiny is misplaced. In turn, there is at least one circumstance (incest committed against minors) in which RCW 9A.64.020 passes rational basis review and can be constitutionally applied, defeating Gantt's facial challenge.

8

Separately, Gantt also argues that the statute is facially unconstitutional "because it does not require proof of either partner's age—it simply bans sexual contact with close relatives regardless of age." Gantt analogizes the incest statute to the statute found in State v. Blake, 197 Wn.2d 170, 183, 481 P.3d 521 (2021), which our Supreme Court found was unconstitutional because it criminalized *unknowing* possession.[6] At oral argument, Gantt argued that, like the statute in Blake, RCW 9A.64.020 is facially unconstitutional because the State is not required "to prove a lack of consent" by, or the age of, the participant to the incest. State v. Gantt, No. 84445-8-I (September 26, 2023), at 7 min., 20 sec., through 7 min., 32 sec, video recording by TVW, Washington State's Public Affairs Network, https://tvw.org/video/division-1-court-of-appeals-2023091215/?eventID=2023091215. Under Gantt's reading of the statute, K.G. was "as guilty as" as Gantt. Wash. Ct. App. oral argument, supra at 6 min., 58 sec., through 7 min., 32 sec.

The holding in Blake does not extend to the present case. There, the Court voided a statute criminalizing "passive and innocent conduct" where the State is not required "to prove any intent or even any action." Blake, 197 Wn.2d at 183 & 195. In making clear it was not "disturb[ing] the legislature's power to enact strict liability crimes," including rape of a child, it explicitly noted that "[s]exual intercourse

---

[6] Gantt first cited to State v. Blake, 197 Wn.2d 170, 183, 481 P.3d 521 (2021) in his reply brief. "'[A]n issue raised and argued for the first time in a reply brief is too late to warrant consideration.'" Norcon Builders, LLC v. GMP Homes VG, LLC, 161 Wn. App. 474, 497, 254 P.3d 835 (2011) (quoting Cowiche Canyon Conservancy v. Bosley, 118 Wn.2d 801, 828 P.2d 549 (1992)). However, as the State was able to, and suffered no prejudice from, addressing Gantt's Blake arguments during oral argument, we will address the Blake based argument here.

is conduct, not passivity." Id. at 193-94. As such, Blake expressly carved out statutes where the "State must . . . show the activity of sexual intercourse, not just innocent passivity," even where "the State need not prove that the defendant knew the victim's age." Id. at 194.

Here, incest is one such statute, as it requires the State to show the defendant "engage[d] in sexual intercourse with a person whom he or she knows to be related to him or her . . . as a descendant." RCW 9A.64.020. The statute, thus, requires both an activity and, going further, knowledge of the offending relationship, even if it is silent as to "consent" or other facts, such as the descendant's age. Thus, incest is outside the dictates of Blake.

Finally, Gantt's challenge still fails under an as-applied analysis. "An as-applied challenge to the constitutional validity of a statute is characterized by a party's allegation that application of the statute in the specific context of the party's actions or intended actions is unconstitutional." Moore, 151 Wn.2d at 668-69. Here, citing RCW ch. 9A.44, Gantt argues that, "[b]ecause K.G. was past the age of consent at the time" of the charged incident and "capable of consenting to sexual intimacy with a partner of any age" under separate Washington statutes, K.G. was not within the class of persons (minors) the State sought to protect from incest.

There is no evidence in the record that K.G.–even if she was an adult or was *capable* of consent under another statute—in fact consented to intercourse with her father. Indeed, from the moment of the first assault, her actions and words indicated she did not consent. Specifically, K.G. testified that she was "scared" when her father began to touch her; that she attempted to confront him about his

10

behavior, to which he reacted with anger; and that she directly told Gantt she "didn't want" to have intercourse. Ultimately, she attempted suicide shortly before reporting the abuse to her school counselor. In other words, the underlying assumption of Gantt's argument (that they were "consenting adults") is without any support in the record. As such, Gantt's challenge would also fail as-applied.

For these reasons, we hold that RCW 9A.64.020 survives Gantt's constitutional challenge, however characterized.

B.    Sufficiency of the evidence

Gantt argues there was insufficient evidence to convict him of counts 2 (child molestation in the second degree) and 5 (rape of a child in the second degree). Specifically, Gantt claims that "K.G. unequivocally and repeatedly testified that [Gantt] was asleep and unaware" for all sexual contact made before K.G. was 14 years old, which was the time period encompassed by those counts. As such, he posits "[i]t is unreasonable to infer Mr. Gantt was faking being asleep when the only witness to the incidents, the complaining witness, repeatedly described him as being asleep and unaware."

The standard for sufficiency of evidence is "whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt when viewing the evidence in a light most favorable to the State." State v. Treat, 109 Wn. App. 419, 426, 35 P.3d 1192 (2001). And a key tenant of our justice system is that "a jury is free to believe or disbelieve a witness, since credibility determinations are solely for the trier of fact." Morse v. Antonellis, 149 Wn.2d 572, 574, 70 P.3d 125 (2003). Further, an appellate court "must defer to the trier of fact

11

for purposes of resolving conflicting testimony and evaluating the persuasiveness of the evidence." State v. Homan, 181 Wn.2d 102, 106, 330 P.3d 182 (2014).

Importantly, here, the trial court gave a lack of volition defense instruction for count 5 (the rape charge) based on K.G.'s testimony that Gantt may have been asleep during the charged acts. As such, "[w]hen reviewing a challenge to the sufficiency of evidence based on an affirmative defense, the inquiry is whether, considering the evidence in the light most favorable to the State, a rational trier of fact could have found the accused failed to prove the defense by a preponderance of the evidence." State v. Edgar, 16 Wn. App. 2d 826, 830, 486 P.3d 898 (2021).[7]

To clarify his challenge, Gantt is not contesting that there is insufficient evidence for a jury to conclude he physically touched K.G. in ways that could support a conviction on those two counts. Rather, Gantt questions whether there was sufficient evidence for a jury to find (a) the State did prove Gantt acted with a conscious purpose (under count 5), and (b) he did *not* establish his volitional defense by a preponderance of evidence (under count 2), where for both challenges we view the evidence in the light most favorable to the State, including issues of credibility determinations. Id. at 830.

Regardless of K.G.'s stated beliefs about whether he was asleep, it was for the jury to weigh the credibility of K.G.'s, or any witness', statements. Morse, 149

---

[7] As will be discussed below, the court ruled that, to carry its burden on count 2, the State had to prove that Gantt was awake, i.e. that he acted with volition, as part of proving he acted for the purpose of sexual motivation. In turn, it did not give the same volition defense instruction as it did for count 5. For purposes of this assignment of error, we will address the sufficiency of the evidence for count 2 based upon the same evidence presented in count 5, although count 2 presents a similar but slightly different standard of review.

Wn.2d at 574. A rational jury could have found that K.G. was accurately stating the facts of Gantt's consciousness, but it also could have reasonably found that she was being naïve, deluding herself, being overly generous to her father, or otherwise being tricked by Gantt into believing he was asleep. In any of these latter ways, a rational juror could have not believed that Gantt was asleep and discounted K.G.'s distant recollection about Gantt's consciousness at that time of the acts underlying counts 2 and 5.

A rational jury also could have found that K.G.'s testimony was not as unequivocal as Gantt claims. For example, she also testified that she was "really young so I had--just didn't know what was going on" at the time. The jury was free to weigh this statement and any others like it during deliberations in determining whether the State met its burden of proof on count 5 and whether Gantt met his burden in establishing the defense on count 2.

The jury was also free to consider Gantt's acts in the context of K.G. confronting him when she was 14. At that time, Gantt reportedly responded angrily and stated "[i]f I'm going to get in trouble for it, I might as well remember doing it." This statement is far from the utter shock and horror one would normally expect from a parent in Gantt's situation, who is truly unconsciously touching his daughter in that way. "A juror properly brings his or her opinions, insights, common sense, and everyday life experience into deliberations." State v. Boyle, 183 Wn. App. 1, 13, 335 P.3d 954 (2014). As such, a reasonable jury could have found that testimony discordant with the claim he was asleep, and conclude Gantt had not met his burden on the volitional defense.

In short, it was solely within the jury's purview as factfinder to "evaluat[e] the persuasiveness of the evidence" in support of Gantt's claim he was asleep for some portion of the charge crimes. Homan, 181 Wn.2d at 106. We defer to the jury's credibility determinations and hold that there was sufficient evidence for both counts 2 and 5. A rational jury could have found there was sufficient evidence he was awake and insufficient evidence as to Gantt's volitional defense.

C.    Volitional defense instruction

As mentioned above, Gantt requested a lack of volition affirmative defense instruction for count 2 (the child molestation charge) as he had received for count 5 (the rape charge).

Child molestation in the second degree requires "sexual contact with another who is at least twelve years old but less than fourteen years old[.]" RCW 91.44.086. "'Sexual contact' is defined as . . . 'any touching of the sexual or other intimate parts of a person done *for the purpose of gratifying sexual desire* of either party or a third party.'" State v. Stevens, 158 Wn.2d 304, 309, 143 P.3d 817 (2006) (quoting RCW 9A.44.010(2)) (emphasis added). In contrast, rape of a child in the second degree does not have a *mens rea* (knowledge or intent requirement) and only requires the defendant have committed the prohibited act. RCW 9A.44.076.

In denying an instruction for count 2, the trial court reasoned that a volitional defense instruction was not needed as that crime has "an intent element to the sexual gratification/sexual contact requirements and as a result there is no need for an affirmative defense in my opinion because the state must prove those items already." To the court, it was "sort of duplicative" to give a volitional instruction for

count 2 when the State was required to prove intent, which presumes consciousness.

The State's brief conceded that volitional defenses "are probably not limited to strict liability crimes as a matter of law." Without so affirmatively finding, we accept this concession that the trial court committed error.[8]

"Refusal to give a requested jury instruction constitutes reversible error when the absence of the instruction prevented the defendant from arguing his or her theory of the case." State v. Teas, 10 Wn. App. 2d 111, 129, 447 P.3d 606 (2019) (citing State v. Buzzell, 148 Wn. App. 592, 598, 200 P.3d 287 (2009)). In Buzzell, this court held that it was error not to provide two warranted instructions. Buzzell, 148 Wn. App. at 600-01. However, we found the error harmless because the defense was able to fully present their theory of the case. Id. (Noting that the defense "presented his theory of the case through his own testimony and counsel's argument"). "We review de novo the trial court's refusal to give a proposed jury instruction when the refusal is based on a ruling of law." Teas, 10 Wn. App. 2d at 129.

As was the case in Buzzell, we hold that Gantt was still able to present his theory of the case. Gantt did not testify at trial, as was his right. Nor did Gantt

---

[8] We accept this concession for the further reason that our Supreme Court has held "'[e]ach party is entitled to have [their] theory of the case presented to the jury, if there is *any* evidence to support it.'" State v. Arbogast, 199 Wn.2d 356, 369, 506 P.3d 1238 (2022) (alteration in original) (quoting Woods v. Goodson, 55 Wn.2d 687, 690, 349 P.2d 731 (1960)) (emphasis added). K.G.'s testimony that Gantt may have been asleep during the specific charged offenses meets this low bar. We do not reach whether the court's decision not to give the instruction *as duplicative* was proper.

present his own witnesses. However, Gantt's attorney still had ample opportunity to develop Gantt's theory of the case while cross-examining the State's witnesses, including K.G.'s testimony that she believed he was asleep.

Additionally, Gantt's attorney argued during closing that "[a] sleeping person can't initiate sexual intercourse; a sleeping person can't touch someone else for the purpose of gratifying sexual desires." After describing the volitional defense for count 5 (the rape charge), his attorney stated that "being asleep is also a defense to child molestation in the 2nd degree" as "'contact for the purpose of sexual gratification . . . is impossible when you are asleep." As such, pursuant to Buzzell, Gantt was still able to present his theory of the case without the instruction, making any error is harmless. Buzzell, 148 Wn. App. at 601.

Finally, Gantt's convictions on counts 2 and 5 were based on the same evidence and both counts concerned conduct that occurred contemporaneously.[9] The jury convicted Gantt on count 5 (the rape charge) despite being given the same volitional defense instruction on that count. It is highly unlikely (and Gantt provides no explanation why) the jury would have found Gantt acted unconsciously for one charge (count 2) and not the other (count 5) when both were based on acts which occurred in a similar manner. From this, we hold that the trial court's erroneous denial of the instruction was harmless beyond a reasonable doubt.

D.    Evidence of common scheme or plan under ER 404(b)

Gantt argues that the abuse recounted in S.G.'s testimony was not

---

[9] Both crimes require the victim be "at least twelve years old but less than fourteen years old[.]" RCW 9A.44.086; RCW 9A.44.076.

"markedly similar" enough to the charged crimes. As such, he alleges the evidence violated ER 404(b) as it "merely served to show [he] had a propensity to molest children and that he likely committed the alleged crimes against K.G. because he committed sex acts against S.G."

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. ER 404(b). "It may, however, be admissible for other purposes, such as proof of . . . [a] plan." A four-factor test is required for evidence admitted under ER 404(b). State v. Gresham, 173 Wn.2d 405, 421, 269 P.3d 207 (2012).

> [T]he trial court must (1) find by a preponderance of the evidence that the misconduct occurred, (2) identify the purpose for which the evidence is sought to be introduced, (3) determine whether the evidence is relevant to prove an element of the crime charged, and (4) weigh the probative value against the prejudicial effect.

Id. (quoting State v. Vy Thang, 145 Wn.2d 630, 642, 41 P.3d 1159 (2002)). "[T]he fourth prong of the ER 404(b) analysis . . . implicates ER 403." State v. Gunderson, 181 Wn.2d 916, 923, 337 P.3d 1090 (2014); ER 403 ("[E]vidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice[.]).

As to the second factor (the purpose) a court may admit other prior bad acts to show a "common scheme or plan" where, among other ways the "prior acts [provide] evidence of a single plan used repeatedly to commit separate but very similar crimes." State v. DeVincentis, 150 Wn.2d 11, 19, 74 P.3d 119 (2003) (quoting State v. Lough, 125 Wn.2d 847, 856, 889 P.2d 487 (1995)). The prior acts and charged crimes must be "'*markedly similar* acts of misconduct against

similar victims under similar circumstances' . . . '[which] are naturally to be explained as caused by a general plan of which they are the individual manifestations.'" Id. (emphasis added).

The standard of review is abuse of discretion if the trial court correctly interpreted the rules of evidence. Gresham, 173 Wn.2d at 422. The trial court properly listed and conducted the four-step ER 404(b) analysis explicitly on the record. As such, we review the court's decisions for abuse of discretion.

Gantt appears to challenge only the final two ER 404(b) factors: relevancy (whether there was a sufficiently common scheme or plan) and prejudice (whether the probative value was substantially outweighed by the danger of unfair prejudice). We will address each in turn.

1. Relevance

In Gresham, our Supreme Court considered a case where the prior acts and charged offenses involved "a trip with young girls and at night, while the other adults were asleep, [the appellant] approached those girls and fondled their genitals." Gresham, 173 Wn.2d at 422-23. The Court held that, "[t]hough there are some differences (e.g. the presence of oral sex), these differences are not so great as to dissuade a reasonable mind from finding that the instances are naturally to be explained as 'individual manifestations' of the same plan." Id. at 423 (quoting Lough, 125 Wn.2d at 860).

Shortly after Gresham was decided, this court considered a sexual assault case, where it held that the prior acts were not sufficiently similar to the charged crimes. State v. Slocum, 183 Wn. App. 438, 333 P.3d 541 (2014). There, the trial

court had admitted evidence of the appellant abusing others (the victim's mother and aunt) when they were a similar age as the victim. Id. at 454. However, "unlike her mother's and aunt's complaints of *isolated incidents* . . . [the victim] alleges molestation that was ongoing, over a period of years." Id. at 454 (emphasis added). Further, "[t]here is no evidence to suggest that the incidents in which [the appellant] was . . . with [the victim's] mother or . . . aunt were *anything but opportunistic*[.]" Id. at 455-56 (emphasis added).

Gantt relies heavily on Slocum, claiming the prior acts in that case "were much more similar than the acts at issue in [his] case." We disagree, even if we were only to compare the similarities and differences involved in Slocum and those presented here. The court there noted "[t]he evidence establishe[d] only" three similarities, namely "that in the case of all three victims, they were young, Mr. Slocum was an adult, and there was a family relation by marriage[,]" Slocum, 183 Wn. App. at 454. Here, importantly, both assaults were "ongoing, over a period of years," as was the case in the charged crime in Slocum. Id.

Moreover, there were numerous other striking similarities between K.G. and S.G.'s separate assault. Both victims were Gantt's biological daughters, not simply some kind of family relation. Both testified the abuse started when they were exactly 11 years old. Both testified the abuse began after their parents' separation. Both further testified the abuse occurred in circumstances where they were alone with Gantt. Both testified Gantt used false pretenses to start his abuse, claiming to be asleep for K.G. and applying lotion to prevent stretch marks for S.G. Both testified their abuse started with Gantt inappropriately touching their bodies before

19

escalating to more intrusive contact. Both testified they were forced to share a bed with Gantt when they experienced the abuse. Gantt also discouraged both from reporting the abuse with threats that doing so would destroy the family.

In sum, the contrast between Slocum and this case is clear. Far from the limited similarities in Slocum, Gantt's prior acts show a designed, methodical, and repeated plan of which the later acts were "individual manifestations." Gresham, 173 Wn.2d at 423. As such, we find that the trial court did not err when finding Gantt's prior acts against S.G. were "markedly similar" and thus relevant to show a common scheme or plan. DeVincentis, 150 Wn.2d at 19.

2. Prejudice

Unlike the preceding section, Gantt's arguments here are much less developed. He generally asserts that the evidence "was substantially more prejudicial than probative" and thus violated "ER 404(b) and ER 403." The conclusory nature of this argument is alone grounds for denying this assignment of error. State v. Elliot, 114 Wn.2d 6, 15, 785 P.2d 440 (1990) ("This court will not consider claims insufficiently argued by the parties.").

More substantively, trial courts have considerable discretion in determining this balance. State v. Barry, 184 Wn. App. 790, 801, 339 P.3d 200 (2014). Further, the probative value of a prior act is substantial where the only direct witness to sexual abuse was the child victim. State v. Sexsmith, 138 Wn. App. 497, 506, 157 P.3d 901 (2007). As such, we hold the trial court did not abuse its discretion when it found the probative value of this 404(b) evidence was not substantially outweighed by the danger of unfair prejudice to Gantt.

E.     Prosecutorial misconduct during closing arguments

Gantt argues that three instances of prosecutorial misconduct occurred during closing arguments.  "A defendant arguing prosecutorial misconduct bears the burden of proving that the conduct was *both improper and prejudicial*."  State v. Babiker, 126 Wn. App. 664, 668, 110 P.3d 770 (2005) (emphasis added).

If an objection was made at trial, the reviewing court decides whether the error "had a substantial likelihood of affecting the verdict."  State v. Sakellis, 164 Wn. App. 170, 183-84, 269 P.3d 1029 (2011).  "If the defendant fails to object to the alleged improper statements, the error is waived unless the comments are *so flagrant and ill intentioned* that the resulting prejudice could not be alleviated by a curative instruction."  Babiker, 126 Wn. App. at 668 (emphasis added).

1.  Shifting the burden of proof

Gantt first alleges misconduct during the State's closing rebuttal argument. He argues the prosecutor improperly shifted the burden by stating that "you heard [the defendant's attorney] talk about [K.G.'s mother's] testimony about her genital herpes, and . . . defense is right, there is no evidence about the way that herpes is transferred because they want you to speculate about it."  This was in response to the following from Gantt's attorney at closing:

> "You heard from K.G. that she doesn't have any sexually transmitted infections – but you heard from [K.G.'s mother] that [the mother] has either herpes or genital warts . . . You heard from her that [the mother] is taking valacyclovir; that is the medication that she is taking to address the herpes or genital warts, and that she gave that medication to [Gantt] and  . . . Gantt was himself prescribed that exact same medication back in 2010."

From this, Gantt's attorney argued "[t]he state wants you to believe [K.G.] when

she says that for years she was having daily unprotected sex with [Gantt] . . . [a]nd the state somehow needs you to believe that in those circumstances, [K.G.] somehow managed to avoid transmission of any of these diseases."

It is generally misconduct for a prosecutor to assert the defense was required to present certain evidence. State v. Sells, 166 Wn. App. 918, 930, 271 P.3d 952 (2012). However, "[t]he mere mention that defense evidence is lacking does not constitute prosecutorial misconduct or shift the burden of proof to the defense." Id. "A prosecutor is entitled to point out a lack of evidentiary support for the defendant's theory of the case." Id. Further, "'[r]emarks of the prosecutor, even if improper, are not grounds for reversal if they were invited or provoked by the defense counsel and are in reply to his or her acts and statements." Babiker, 126 Wn. App. at 668 (quoting State v. Russell, 125 Wn.2d 24, 86, 882 P.2d 747 (1994)).

Gantt's attorney objected to the prosecutor's comments as burden shifting. As such, this challenge falls under the regular standard of whether the conduct was both improper and prejudicial. However, as stated in Sells, a prosecutor's mere mention that the defense's evidence is lacking does not constitute misconduct or shift the burden to the defense. Sells, 166 Wn. App. at 930. Further, in line with Babiker, the prosecutor's comments were in direct response to an argument by Gantt's attorney during closing. As such, we find the prosecutor did not commit misconduct here.

2. Instructing the jury to rely on facts not in evidence

Gantt next alleges that the prosecutor improperly told the jury they could

22

rely on facts not in evidence. Specifically, the prosecutor stated that "what you can use in this case is your *common sense and your experience*, and it is common knowledge that while herpes certainly is contagious, it can be controlled and the risk of transfer can be minimized by somebody taking medications or taking precautions[.]" (emphasis added).

Unlike the prior challenge, Gantt's attorney failed to object to this alleged misconduct. As such, Gantt must establish that the alleged error was "so flagrant and ill intentioned that the resulting prejudice could not be alleviated by a curative instruction." Babiker, 126 Wn. App. at 668.

Even assuming, *arguendo*, there was an error, Gantt did not establish the resulting prejudice "could not be alleviated by a curative instruction." Babiker, 126 Wn. App. at 668. For instance, the court could have issued a very specific instruction clarifying that the jurors can only consider evidence properly admitted at trial. "Jurors are presumed to follow the court's instructions." Matter of Phelps, 190 Wn.2d 155, 172, 410 P.3d 1142 (2018). In fact, the court did issue an instruction, which advised the jury that "[t]he evidence that you are to consider during your deliberations consists of the testimony that you have heard from witnesses and the exhibits that I have admitted during the trial." Either way, we hold that Gantt failed to show any prejudice was not curable or cured.

3. Misstating the law by conflating counts

Finally, Gantt alleges that the prosecutor misstated the law by telling the jury they could use DNA evidence from a sexual assault examination when K.G. was 17 to find Gantt guilty of crimes alleged to have occurred when she was

between 14 and 15.

The prosecutor had been discussing count 3, third degree child rape, which covered the time period when the victim was 14 and 15. Immediately after, the prosecutor stated that "[y]ou have got DNA in this case after that weekend that [K.G.] spent alone with her father in January 2017, and that tells you all you need to know about what happened that weekend, that the defendant actually did have sexual intercourse and make [K.G.] have sexual intercourse with him." K.G. had turned 17 in 2016. Gantt's attorney did not object, meaning the heightened 'flagrant and ill intentioned' standard applies.

The jury was instructed to "decide each count separately[.]" However, it was not instructed to view evidence supporting each count in isolation. This court has held that in the absence of a limiting instruction, a "jury was to decide each count separately and was free to consider any evidence relevant to count 1 in deciding count 1. It was free to consider any evidence relevant to count 2 in deciding count 2." State v. Bradford, 60 Wn. App. 857, 861, 808 P.2d 174 (1991).

Further, "in the absence of a limiting instruction, the jury is permitted to consider the evidence for *any* purpose[.]" State v. Mohamed, 186 Wn.2d 235, 244, 375 P.3d 1068 (2016). "Evidence is 'relevant' if it makes the existence of a fact of consequence more or less probable to be true than without the evidence." State v. Arredondo, 188 Wn.2d 244, 259, 394 P.3d 348 (2017). Additionally, prosecutors are generally afforded "wide latitude to argue reasonable inferences from the evidence." State v. Slater, 197 Wn.2d 660, 680, 486 P.3d 873 (2021).

As such, we conclude, first, that it was within the jury's power, acting without

24

a limiting instruction, to consider the DNA evidence. Second, we conclude it was reasonable inference by the prosecutor that the DNA evidence collected when K.G. was 17 made it more likely that K.G. was truthful about Gantt's abuse when she was 14 to 16 years old. As such, this statement was not misconduct. Finally, even if it was misconduct, Gantt does not establish the resulting prejudice was incurable by an instruction. Babiker, 126 Wn. App. at 668 ("If the defendant fails to object . . . the error is waived unless . . . prejudice could not be alleviated by a curative instruction"). For instance, the court could have instructed the jury to only consider evidence within the range of conduct covered by each charge, which the jury would have been "presumed to [have] follow[ed]." Phelps, 190 Wn.2d at 172. In fact, the jury received numerous instructions that repeatedly stated the child molestation and rape of a child charges were limited to Gantt's actions within specific dates corresponding to K.G.'s age. As such, we hold that Gantt failed to meet the heightened "flagrant and ill intentioned" standard.

F.      Biased juror

In his SAG, Gantt claims the trial court violated his right to an impartial jury when it allowed a biased juror to be empaneled. Gantt is referring to Juror 22, who indicated they would have difficulty presuming Gantt's innocence because it was a child who complained. Gantt's attorney struck Juror 22 using a peremptory challenge. The trial court excused the juror and stated "[o]kay, [Juror] 57 moves into the box." By the end of voir dire, Gantt's attorney had used six, but not all,[10]

---

[10] Before trial, the court explained to Gantt's counsel that "the way that we do it in this court is that I allow six peremptories per side and then the alternates are picked at random at the end of the court date--at the end of the trial, *so you have basically*

of his peremptory challenges. Gantt's attorney twice accepted the panel.

On this record, it is clear that Juror 22 was excused. It is exceedingly unlikely Gantt's attorney would have accepted the panel, twice no less, if Juror 22 had somehow not left the courtroom when excused, somehow simply moved into seat 3, and somehow was empaneled. It would be equally unlikely that the court and its staff, the State, and the other jurors all somehow missed this oversight as well. Instead, it is highly likely this was a clerical mistake or simply a misstatement by the court.[11]

G.      Community custody conditions

In his SAG, Gantt also challenges community custody conditions 5, 9, and 15 within his judgment and sentence. "'[F]or an objection to a community custody condition to be entitled to review for the first time on appeal, (1) it must be manifest constitutional error or a sentencing condition that … is 'illegal or erroneous' as a matter of law, and (2) it must be ripe.'" State v. Reedy, 26 Wn. App. 2d 379, 391-92, 527 P.3d 156 (2023) (quoting State v. Peters, 10 Wn. App. 2d 574, 583, 455 P.3d 141 (2019). According to his attorney, Gantt reviewed the judgment and sentence prior to his sentencing hearing. However, Gantt made no objection to

---

*eight peremptories* . . . because you have one per alternate and the six that you are given already." see CrR 6.4(e)(1), 6.5.

[11] Even if we assume that somehow Juror 22 was part of the panel, where "a party who does not use all of their peremptory challenges and accepts the jury panel as presented" may nevertheless not appeal "on the basis that a seated juror should have been dismissed for cause," as Gantt now attempts to do. State v. Talbot, 200 Wn.2d 731, 737, 521 P.3d 948 (2022). In Talbot, the defendant had a total of five unexercised peremptory challenges, two of the six allotted under CR 6.4(e)(1) and one extra challenge for each of the three alternate jurors under CrR 6.5. Id. at 736, fn. 1. In the present case, Gantt's attorney had two unused peremptory challenges, meaning this assignment of error is waived.

any condition at sentencing.

Community custody conditions are reviewed for abuse of discretion. State v. Nguyen, 191 Wn.2d 671, 678, 425 P.3d 847 (2018). A trial court abuses its discretion where a condition is either unconstitutional or manifestly unreasonable. Id. at 678. Community custody conditions are not presumed to be constitutional. State v. Irwin, 191 Wn. App. 644, 652, 364 P.3d 830 (2015).

1. Condition 5

This condition contains three parts. It requires Gantt to (1) inform the supervising CCO of any "dating relationship," (2) disclose his sex offender status prior to any sexual contact, and (3) receive approval from his treatment provider before engaging in any sexual contact.

Gantt argues that the third provision of condition 5 is unconstitutionally vague and cites to an unpublished Division II case, State v. Paz Alvarez, No. 54548-9-II, (Wash. Ct. App. Feb. 8, 2022) (unpublished), https://www.courts.wa.gov/opinions/pdf/D2%2054548-9-II%20Unpublished%20Opinion.pdf. Gantt's mischaracterizes Paz Alvarez as broadly holding that condition 5 is unconstitutionally vague. The case only held that condition 5 was unconstitutional "as it pertains to Paz Alvarez's circumstances." Paz Alvarez, No. 54548-9-II, slip op. at 19. Those circumstances were that Paz Alvarez was evaluated and determined not to have a pedophilic disorder, meaning he was unlikely to be assigned a treatment provider. Id. at 18. Here, however, Gantt merely speculates that he may "not necessarily have a sexual deviancy treatment provider assigned to him[.]" If he does not, then the

27

condition is irrelevant; if he does, then it is outside the unusual circumstance presented in Paz Alvarez.

"Claims are ripe for judicial review 'if the issues raised are primarily legal and do not require further factual development, *and the challenged action is final.*'" Wash. Commc'n Access Project v. Regal Cinemas, Inc., 173 Wn. App. 174, 208, 293 P.3d 413 (2013) (quoting Neighbors & Friends of Viretta Park v. Miller, 87 Wn. App. 361, 383, 940 P.2d 286 (1997)). "If a claim is speculative and hypothetical, it is not ripe." Lewis County v. State, 178 Wn. App. 431, 440, 315 P.3d 550 (2013). Here, Sanchez merely speculates on a potential future action from a hypothetical treatment provider. As such, his claim is not ripe for review.

As to the first two provisions of this condition, our Supreme Court, moreover, has held that "dating relationship" is not an unconstitutionally vague term. Nguyen, 191 Wn.2d at 683. And, this court has upheld the disclosure requirements as they protect individuals "by providing them with knowledge of the potential risk he presents to minors" and "make it possible for [the] CCO and treatment provider to take whatever additional steps . . . to protect anyone embarking on a dating or sexual relationship with [the offender]." In the Matter of Sickels, 14 Wn. App. 2d 51, 60-61, 469 P.3d 322 (2020). The requirement for treatment provider approval is "common for sexual offenders" as "'the offender's freedom of choosing even adult sexual partners is reasonably related to their crimes because potential romantic partners may be responsible for the safety of live-in or visiting minors.'" Id. at 61 (quoting State v. Lee, 12 Wn. App. 2d 378, 403, 460 P.3d 701 (2020)). As such, this challenge fails.

28

2. Condition 9

This condition requires Gantt to "not consume alcohol." Gantt argues that this condition is not sufficiently crime related. He cites to RCW 9.94A.030(10) for the proposition that a "[c]rime-related prohibition" must be "directly relate[d] to the circumstances of the crime for which the offender has been convicted." "'Directly related' includes conditions that are 'reasonably related' to the crime." Irwin, 191 Wn. App. at 656 (quoting State v. Kinzle, 181 Wn. App. 774, 785, 326 P.3d 870).

A court does not abuse its discretion if a "reasonable relationship" exists between the crime of conviction and the community custody condition. Nguyen, 191 Wn.2d at 684. "The prohibited conduct need not be identical to the crime of conviction, but there must be '*some basis* for the connection.'" Id. (quoting Irwin, 191 Wn. App. at 657) (emphasis added).

The record indicates that Gantt supplied K.G. with both alcohol and drugs during the period of abuse. However, K.G. distinguished her usage of alcohol from drugs stating that "I didn't like alcohol, so I had drinks one time and I got like really out of control and I didn't like it at all, so I didn't do it again until I was out of his house."

The record also discusses Gantt's own significant alcohol usage during the period of abuse. This included Gantt's increasing use of alcohol as discussed in his mitigation report. Additionally, K.G. testified that "[f]rom what I remember [Gantt] drank all the time."

Alcohol was not the main issue in this case, nor was it what Gantt based his volitional defense on. However, alcohol still bears a reasonable relationship to the

crime as Gantt supplied alcohol and other controlled substances to K.G. during his long-term pattern of abuse. As such, this challenge fails.

3. Condition 15

This condition requires Gantt "[h]ave no direct or indirect contact with minors." The court wrote in an exception for his biological children, as long as the mother is present and aware of the nature of his convictions. Gantt now complains, not about how the condition restricts contact with his biological children, but about his inability to attend family events where minors, such as nephews or grandchildren, may be present.

The fundamental right to raise a child does not appear to extend far, if at all, beyond the immediate relationship between parent and child. See Troxel v. Granville, 530 U.S. 57, 63, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000) (upholding our Supreme Court's decision to strike down a statute that allowed any third party to petition courts for visitation rights over parental objections). Even if the fundamental right to parent was implicated, the court took great care to write in an exception which still allows Gantt to see his biological children. As such, given the seriousness of Gantt's convictions, the condition was "sensitively" imposed and no more is required on these facts. As such, this challenge fails.

III.    CONCLUSION

For the reasons stated above, we affirm Gantt's conviction on all counts.

Díaz, J.

WE CONCUR:

Bruman, J

Smith, C.J.